In the Matter of GRAND BAHAMA
PETROLEUM COMPANY, LIMITED,
Petitioner-Appellee,

v.

ASIATIC PETROLEUM CORPORATION,
Respondent-Appellant.

No. 152, Docket 76–7222.

United States Court of Appeals,
Second Circuit.

Argued Nov. 9, 1976.

Decided March 3, 1977.

Peter E. Calamari, New York City (Cravath, Swaine & Moore, John R. Hupper, and Anthony A. Dean, New York City, Thomas R. McDade, Houston, Tex., and John M. Rochford, Secretary, Asiatic Petroleum Corp., New York City, on the brief), for respondent-appellant.

Samuel N. Greenspoon, New York City (Eaton, Van Winkle & Greenspoon, New York City, on the brief), for petitioner-appellee.

Before HAYS, ANDERSON and TIMBERS, Circuit Judges.*

ROBERT P. ANDERSON, Circuit Judge:

This is a proceeding to answer the following question, certified to this court pursuant to 28 U.S.C. § 1292(b):

---

\* Pursuant to § 0.14 of the Rules of this Court, this appeal is being determined by Judges Anderson and Timbers who are in agreement on this opinion. Judge Hays heard argument on November 9, 1976, but has not had an opportunity to participate further in the case because of illness.

1. BCL § 1312(a) provides:
 "A foreign corporation *doing business* in this state without authority *shall not maintain any action or special proceeding in this state unless and until* such corporation has been authorized to do business in this state and it

---

"Whether [New York's Business Corporation Law] BCL § 1312 may be invoked to preclude a non-qualifying foreign corporation from maintaining an action predicated upon diversity jurisdiction to compel arbitration pursuant to the Federal Arbitration Act, 9 U.S.C. § 1, *et seq.*"

The district court felt that there was substantial ground for difference of opinion on this issue, citing *In Re Master Key Antitrust Litigation*, 528 F.2d 5 (2d Cir. 1975), although it did have some reservations as to whether its order involved "a controlling question of law" as prescribed by the statute. It was of the opinion, however, that if BCL § 1312(a)[1] could be invoked by Asiatic Petroleum Corp. (Asiatic), a New York corporation, against Grand Bahama Petroleum Co. (Grand Bahama), a Bahamian corporation, "the action would terminate at once without the necessity for trial by jury of the present issues before the court pursuant to 9 U.S.C. § 4," and that therefore the matter qualified under the requirement of 28 U.S.C. § 1292(b) that resolution of the legal issue "may materially advance the ultimate termination of the litigation. . . . " This court granted leave to appeal on April 29, 1976.

The certified question arises out of a petition to compel arbitration under the United States Arbitration Act, 9 U.S.C. § 1 *et seq.*, initiated by Grand Bahama against Asiatic. In compliance with 9 U.S.C. § 4, the declared jurisdictional basis of the petition were diversity of citizenship and more than $10,000 in controversy.

The Petition alleged that Grand Bahama and Asiatic had signed an agreement[2] in April, 1972, whereby Asiatic agreed to sell

---

has paid to the state all fees, penalties and franchise taxes for the years or parts thereof during which it did business in this state without authority. This prohibition shall apply to any successor in interest of such foreign corporation." (Emphasis added.)

2. The agreement was negotiated and signed in New York, New York, for Grand Bahama by employees and officers of its parent company, New England Petroleum Corp., a New York corporation.

and deliver to Grand Bahama 32,000 barrels per day of No. 6 fuel oil, while Grand Bahama agreed to pay for the oil. Deliveries would take place between April 1, 1972 and March 31, 1978, in accordance with various terms and provisions of the agreement and subject to a clause referring all controversies and claims arising therefrom to arbitration in New York City. The rules of The American Arbitration Association were to govern. It was also agreed that judgment upon any award could be entered in any court having appropriate jurisdiction.

Paragraph 2(d)(iv) of the 1972 agreement provided that price renegotiations for fuel oils to be delivered during each calendar year after 1974 were to take place during the fourth calendar quarter of the preceding year. If the parties could not agree on a price, either party was given the right to terminate the agreement by giving 60 days notice. Pursuant to this Paragraph, Asiatic notified Grand Bahama on September 13, 1974 that it wished to renegotiate a price for 1975 oil deliveries. Negotiations did not go well, and Asiatic wrote to Grand Bahama on December 4, 1974 that if agreement was not reached by December 31, 1974, the contract would be terminated as of March 2, 1975. Grand Bahama replied that it did not consider Asiatic's new price proposals as "good faith efforts to renegotiate the fuel oil price" and shortly thereafter, on December 18, 1974, Grand Bahama served and filed a demand for arbitration with the American Arbitration Association pursuant to the 1972 agreement provisions. On January 10, 1975, pursuant to the 1972 agreement, Asiatic gave written notice of termination (effective March 2, 1975) because the parties had been unable to agree on 1975 fuel oil prices. Grand Bahama unsuccessfully sought to enjoin Asiatic in Supreme Court, New York County, from terminating the contract. It next sought to prevent the agreement's termination through an expedited preliminary hearing before the arbitrators pursuant to the earlier demand for arbitration. The hearing took place on February 28, 1975, two days before the expiration date under Asiatic's notice. As a result of the hearing, an interim agreement was entered into on February 28, 1975 by stipulation of the parties, through which Asiatic would continue delivering No. 6 fuel oil to Grand Bahama and its parent company, New England Petroleum Corp., a New York corporation, pending the final award of the arbitrators. This stipulation was in turn amended on April 28, 1975 by a supplemental written agreement which provided that disputes arising therefrom "may be submitted to the Panel of Arbitrators in this proceeding. . . . "

Asiatic did in fact continue to deliver oil to Grand Bahama and New England Petroleum Corp. during the pendency of the arbitration proceedings. Grand Bahama, however, served and filed another demand for arbitration with the American Arbitration Association on May 29, 1975, claiming that it had been overcharged many millions of dollars by Asiatic. Grand Bahama has alleged in the present petition to compel arbitration that as of February, 1976, Asiatic had not filed any counterclaims in this latest arbitration and had "simply stricken whatever lists of arbitrators have been supplied by the AAA [American Arbitration Association]."

On October 22, 1975, the arbitrators made their award on the original claims of Grand Bahama, found that Asiatic's purported termination of the 1972 agreement was not effective, and directed Asiatic specifically to perform the agreement. A judgment of the Supreme Court, New York County, was entered on the award on January 8, 1976, as the parties had stipulated in the 1972 Agreement.

Meantime, however, the controversy over alleged overcharges by Asiatic continued to be a matter of major concern. Grand Bahama took delivery of three shipments of oil on September 13, 14 and 15, 1975, for which Asiatic claims it was never paid. As a result Asiatic instituted a diversity action against Grand Bahama in the Southern District of Texas to recover the value of the three shipments. Grand Bahama then filed the present petition, based upon diversity jurisdiction, to compel arbitration under the

United States Arbitration Act, 9 U.S.C. § 1, *et seq.*, in the Southern District of New York. In addition to arbitration, Grand Bahama sought temporary and permanent injunctions against Asiatic's maintenance of its action in the Southern District of Texas. It also alleged that Asiatic was in violation of the arbitrators' award of October 22, 1976 and the judgment entered thereon on January 8, 1976. It further claims that Asiatic could not sue in Texas on the theory that the September, 1975, oil deliveries in question "were made pursuant to the arrangement worked out in the arbitration," presumably the April 28, 1975 written agreement between Asiatic and Grand Bahama, which continued oil shipments during the pendency of the arbitration proceedings.

Soon after the February 25, 1976 filing of Grand Bahama's petition to compel arbitration, the district court in the Southern District of New York issued a show cause order to proceed to arbitration. On March 1, 1976 Asiatic filed a notice of taking the deposition of Grand Bahama through various officers and directors thereof. Next, Grand Bahama successfully moved for an order quashing Asiatic's notice to take depositions. In its memorandum opinion of March 11, 1976, the district court noted that the depositions sought by Asiatic were for the limited purpose of determining whether Grand Bahama was " 'doing business' within in the State of New York within the meaning of § 1312(a) of the New York Business Corporation Law ('BCL') which would preclude petitioner [Grand Bahama] from bringing suit in this court." Asiatic reasoned that given the district court's diversity jurisdiction, and assuming Asiatic could show that Grand Bahama was "doing business" in New York within the meaning of BCL § 1312(a), the district court would be compelled to stay the action pending Grand Bahama's payment of the requisite New York fees and franchise taxes. The court instead agreed with Grand Bahama that because the petition had been brought under the United States Arbitration Act and "there is a body of federal substantive law which governs the case, *Robert Lawrence*

*Co. v. Devonshire Fabrics, Inc.*, 271 F.2d 402 (2d Cir.), *cert. denied,* 364 U.S. 801, 81 S.Ct. 27, 5 L.Ed.2d 37 (1960); *Lawn v. Franklin,* 328 F.Supp. 791 (S.D.N.Y.1971)," BCL § 1312(a) was not applicable even though the petition's underlying jurisdiction rested on diversity. The court also held that "[i]t is unnecessary to look to State law for any purpose once jurisdiction has been obtained; and § 1312 is not a jurisdictional requirement. *Hot Roll Mfg. Co. v. Cerone Equipment Co.*, 38 A.D.2d 339, 329 N.Y.S.2d 466 (3d Dept. 1972)."

Following the denial of Asiatic's motion to dismiss, the district court considered Asiatic's motion to reconsider the March 11th order quashing notice of depositions or, in the alternative, for a certificate pursuant to 28 U.S. § 1292(b) for leave to appeal the order. The court reaffirmed its March 11th order, but granted the § 1292(b) certificate for the reasons set out at the beginning of this opinion.

 At the outset, this court is confronted with a *res judicata* issue, which was neither fully briefed nor orally argued by either side. As pointed out at the beginning of this opinion, the arbitrators' October 22, 1976 award to Grand Bahama was entered as a judgment in the Supreme Court, New York County, on January 8, 1976. During this prior proceeding, Asiatic could have raised the very same issue of Grand Bahama's purported non-compliance with BCL § 1312(a) that it now presses before this court and the Southern District of New York. Well-established principles of *res judicata* dictate that a final judgment on the same claim or demand between the same parties is conclusive both as to matters actually litigated and those that could have been litigated, *Cromwell v. County of Sac,* 94 U.S. 351, 24 L.Ed. 681 (1876); *Commissioner of Internal Revenue v. Sunnen,* 333 U.S. 591, 68 S.Ct. 715, 92 L.Ed. 898 (1948); *Saylor v. Lindsley,* 391 F.2d 965, 968 (2d Cir. 1968); 1 B *Moore's Federal Practice* ¶ 0.405[1] (1965 ed). It is equally clear that the doctrines of *res judicata* and collateral estoppel apply in New York arbitration proceedings, 8 Weinstein,

Korn & Miller, *New York Civil Practice* ¶ 7514.03 at 75–192 (1976 ed.). Grand Bahama alleged in its Petition to Compel Arbitration that the three cargoes of oil which comprise the present dispute are controlled by the arbitrators' award and New York judgment. The argument could be further extended to include the assertion that Asiatic is now barred from re-litigating the issue of the arbitration clause's enforceability and related matters. This court recognizes, however, that "[j]udgment on an award does not bar an action or further arbitration under the contract on an issue not before the arbitrators," *Id.*, at 75–192; *Matter of Nors Holding Corp.*, 261 App.Div. 997, 26 N.Y.S.2d 686 (2d Dep't 1941). In view of this court's ruling on the certified question, *infra*, however, the applicability of *res judicata* to this proceeding need not be further considered.

 On full consideration of the certified question, this court holds that BCL § 1312(a) may not be raised in an action to compel arbitration brought pursuant to the United States Arbitration Act with diversity as the jurisdictional basis. It is first of all highly significant that this action is brought under the Arbitration Act for, as this court found in *Robert Lawrence Co. v. Devonshire Fabrics, Inc., supra,* 271 F.2d at 404–5:

> "We find a reasonably clear legislative intent [in the enactment of the Arbitration Act] to create a new body of substantive law relative to arbitration agreements affecting commerce or maritime transactions. Thus we think we are here dealing not with state-created rights but with rights arising out of the exercise of the Congress of its constitutional power to regulate commerce and hence there is invoked no difficult question of constitutional law under *Erie.*"

The Supreme Court approved this court's *Robert Lawrence* holding in *Prima Paint Corp. v. Flood & Conklin Mfg. Co.,* 388 U.S. 395, 399–400, 87 S.Ct. 1801, 18 L.Ed.2d 1270 (1967), where it went on to note:

> "And it is clear beyond dispute that the federal arbitration statute is based upon

and confined to the incontestable federal foundations of 'control over interstate commerce and over admiralty.' H.R.Rep. No.96, 68th Cong., 1st Sess., 1 (1924); S.Rep.No.536, 68th Cong., 1st Sess., 3 (1924)." 388 U.S. at 405, 87 S.Ct. at 1806.

Thus, while it is settled that the United States Arbitration Act will control the substantive questions as to the validity and interpretation of arbitration agreements, *Robert Lawrence, supra,* at 406, the issue here becomes whether a state "door closing" statute such as New York's BCL § 1312(a) does and can affect the district court's jurisdiction based upon diversity of citizenship. *Hot Roll Mfg. Co. v. Cerone Equipment Co., supra,* faced and decided the issue of BCL § 1312(a)'s jurisdictional effect. New York's Third Department there held that:

> "Failure of a foreign corporation doing business in New York to comply with the requirement of subdivision (a) of section 1312 of the Business Corporation Law affects that corporation's legal capacity to maintain the action; it does not affect jurisdiction . . . ."

The *Hot Roll, supra,* holding logically followed prior decisions of the New York courts that the word "maintain" in BCL § 1312(a) does not mean "commence," so that a New York court would not be forced to dismiss an action, once begun, for failure of a party to comply with § 1312(a) but the party may pay the fees and taxes and then go forward with his action. *Hooton Chocolate Co. v. Star Chocolate Novelties Inc.,* 63 Misc.2d 482, 311 N.Y.S.2d 698 (Sup.Ct.1970); *Oxford Paper Co. v. S. M. Liquidation Co.,* 45 Misc.2d 612, 257 N.Y.S.2d 395, 399 (Sup. Ct.1965). Consequently the district court's jurisdiction is unaffected by BCL § 1312(a); and Grand Bahama may proceed with this action in the federal courts.

Even if BCL § 1312(a) may be described as affecting the district court's jurisdiction, New York may not place such a financial and procedural burden on a foreign corporation seeking to vindicate its right to bring a diversity action before the federal courts. In *Markham v. City of Newport News,* 292

F.2d 711 (4th Cir. 1961), a diversity case involving the purported application of a Virginia statute limiting tort actions against a city or other political subdivision to a court of the Commonwealth, the court held:

"In determining its own jurisdiction, a District Court of the United States must look to the sources of its power and not to the acts of states which have no power to enlarge or to contract the federal jurisdiction." 292 F.2d at 713.

This basic principle of Federalism is not affected by the Supreme Court's decision in *Erie R. Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), and the doctrine announced therein. The *Markham, supra,* court noted that:

"The Erie doctrine does not extend to matters of jurisdiction or, generally, to matters of procedure. . . . A nonresident litigant on resorting to the federal diversity jurisdiction should obtain the same relief a resident litigant asserting the same cause of action would receive in the state courts." 292 F.2d at 718.

In the present case, of course, a New York resident litigant would not be subject to BCL § 1312(a) in the courts of New York. If a nonresident litigant is to receive the same relief as a resident of New York in a federal diversity suit, then, the offending local statute must give way. To rule otherwise would enable any state to place impermissible financial conditions on free access to the federal courts by those litigants who have met the federal jurisdictional requirements, *Terral v. Burke Construction Co.,* 257 U.S. 529, 532–33, 42 S.Ct. 188, 66 L.Ed. 352 (1922).

In a decision following *Markham, supra, Szantay v. Beech Aircraft Corp.,* 349 F.2d 60 (4th Cir. 1965), the Fourth Circuit reviewed major Supreme Court opinions interpreting *Erie,* including *Guaranty Trust Co. v. York,* 326 U.S. 99, 65 S.Ct. 1464, 89 L.Ed. 2079 (1945) (wherein the Court announced the "outcome determinative" test: "The outcome of the litigation in federal courts should be substantially the same, so far as legal rules determine the outcome of a litigation, as it would be if tried in a State court." 326 U.S. at 109, 65 S.Ct. at 1470); *Angel v. Bullington,* 330 U.S. 183, 67 S.Ct. 657, 91 L.Ed. 832 (1947), and *Byrd v. Blue Ridge Cooperative,* 356 U.S. 525, 78 S.Ct. 893, 2 L.Ed.2d 953 (1958), in determining not to apply South Carolina's "door closing" statute to wrongful death diversity actions. In the *Szantay* case, the Fourth Circuit, in resolving federal-state conflicts in a diversity case, stated:

"1. If the state provision, whether legislatively adopted or judicially declared, is the substantive right or obligation at issue, it is constitutionally controlling.

2. If the state provision is a procedure intimately bound up with the state right or obligation, it is likewise constitutionally controlling.

3. If the state procedural provision is not intimately bound up with the right being enforced but its application would substantially affect the outcome of the litigation, the federal diversity court must still apply it unless there are affirmative countervailing federal considerations. This is not deemed a constitutional requirement but one dictated by comity." (Footnote omitted.) 349 F.2d at 63–64.

See also, *Byrd v. Blue Ridge Cooperative, supra,* at 537–38; Meador, *State Law and the Federal Judicial Power,* 49 Va.L.Rev. 1082, 1100, *et seq.* (1963). Applying the thorough test of *Szantay, supra,* to the situation here, it is readily evident that BCL § 1312(a) has no relationship to the substantive right, the enforceability of the arbitration clause, nor can it be considered a procedure intimately bound up with any "state right or obligation," because the "right" is a federal one, *Robert Lawrence Co. v. Devonshire Fabrics, supra,* 271 F.2d at 404–5. As for the third prong of the *Szantay, supra,* test, there is a definite federal interest in seeing to it that federal control over arbitration contracts involving interstate or foreign commerce not be frustrated or burdened by state statutes such as BCL § 1312(a), *Prima Paint Corp. v. Flood &*

*Conklin Mfg. Co., supra,* 388 U.S. at 405, 87 S.Ct. 1801.

Despite these persuasive precedents, however, and based primarily on *Woods v. Interstate Realty Co.,* 337 U.S. 535, 69 S.Ct. 1235, 93 L.Ed. 1524 (1949), Asiatic argues that "door closing" statutes must be given full effect by a federal court in cases brought under diversity jurisdiction. *Woods, supra,* concerned the application of Mississippi's "door closing" statute, similar to New York's BCL § 1312(a), in a diversity action involving a broker's commission from the sale of real estate in Mississippi. Citing *Angel v. Bullington, supra,* and *Guaranty Trust Co. v. York, supra,* the Court applied the Mississippi "door closing" statute. Dissenting, Justice Jackson noted that the Mississippi statute, by its own terms, closed only state, and not federal, courts to unqualified corporate litigants and did not deprive the contract in question of its validity. By thus reading the state statute to prevent a litigant from resorting to either a federal or state forum, an unwarranted expansion of the statute's terms and restrictions, the majority was "doing the very thing we profess to avoid; that is, giving the state law a different meaning in federal court than the state courts have given it." 337 U.S. at 539, 69 S.Ct. at 1238.

■■■ *Woods, supra,* is readily distinguishable from the instant proceeding on its facts. First, the brokerage contract in *Woods* was undoubtedly governed by local law. The Supreme Court had earlier written in *Erie, supra,* that:

> "Except in matters governed by the Federal Constitution or by Acts of Congress, the law to be applied in any case is the law of the state." 304 U.S. at 78, 58 S.Ct. at 822.

Unlike *Woods,* this case is "governed" by an Act of Congress, the Arbitration Act. That BCL § 1312(a) may now be applied to Grand Bahama so as to frustrate the petitioner's access to a federal forum to litigate an admittedly federal matter and thereby limit the uniform and effective application of a federal statute, *Robert Lawrence Co. v. Devonshire Fabrics Inc., supra,* 271 F.2d at 406–7; *In re A/S J. Ludwig, Mowinckles Rederi v. Dow Chemical Co.,* 25 N.Y.2d 576, 307 N.Y.S.2d 660, 662, 255 N.E.2d 774 (1970), is a result not contemplated by *Erie.* As the Court wrote in *Sola Electric Co. v. Jefferson Electric Co.,* 317 U.S. 173, 63 S.Ct. 172, 87 L.Ed. 165 (1942):

> "But the doctrine of . . . [*Erie R. Co. v. Tompkins, supra*] is inapplicable to those areas of judicial decision within which the policy of the law is so dominated by the sweep of federal statutes that legal relations which they affect must be deemed governed by federal law having its source in those statutes, rather than by local law." 317 U.S. at 176, 63 S.Ct. at 174.

*See also,* 1A (Part 2) *Moore's Federal Practice,* ¶ 0.324 (1974).

Further light on the correct meaning and application of *Woods, supra,* is provided by *Allenberg Cotton Co. v. Pittman,* 419 U.S. 20, 95 S.Ct. 260, 42 L.Ed.2d 195 (1974). In that case the Court again considered the application of the Mississippi "door closing" statute to a Tennessee corporation suing in a Mississippi state court on a cotton contract. The Mississippi Supreme Court previously had found the contract was wholly intrastate in nature, 419 U.S. at 24, 95 S.Ct. 260. Nonetheless, the Court concluded that the contract was part of a " 'unitary interstate transaction,' " *id.* at 33, 95 S.Ct. 260, and went on to hold that:

> "Mississippi's refusal to honor and enforce contracts made for interstate or foreign commerce is repugnant to the commerce clause." *Id.* at 34, 95 S.Ct. at 267.

*Allenberg* stands for the proposition that a state "door closing" statute may not impede a diversity action concerning interstate or foreign commerce, which the present case unquestionably does, brought in a federal court.[3]

---

**3.** In *Eli Lilly & Co. v. Sav-On-Drugs, Inc.,* 366 U.S. 276, 81 S.Ct. 1316, 6 L.Ed.2d 288 (1961), Lilly sued Sav-On-Drugs in a state court on a contract which the court found to be "entirely separable from any particular interstate sale . . . ." *Id.* at 282–83, 81 S.Ct. at 1320. The

■ Asiatic's attempt to distinguish *Allenberg* is not persuasive. Appellant claims that *Allenberg* in fact supports its view that BCL § 1312(a) must here be applied, because the Court's result in that case was reached solely after a factual finding that the foreign corporation did not have sufficient intrastate contacts in Mississippi to justify a requirement that it qualify to do business there. 419 U.S. at 33, 95 S.Ct. 260. This reading of *Allenberg* is both overly restrictive of the Court's holding and ignores the facts that the case before *this* court invokes both a federal forum, at the trial level, unlike the situation in *Allenberg*, and, more importantly, the undisputed application of the Arbitration Act, a federal statute, because the contract in question involves foreign commerce. It is further of significance that Asiatic has made no *prima facie* showing, through affidavits or other means, to support its claim that Grand Bahama *is* doing business in New York, other than by negotiating and signing in the State, the contract at issue. Asiatic's request for discovery on the matter is, therefore, nothing more than a "fishing expedition," which would needlessly delay the proceeding.

Accordingly, the certified question is answered in the negative and the case is remanded to the district court for further proceedings not inconsistent with this opinion.

---

application of New Jersey's "door closing" statute to Lilly was upheld, a result consistent with *Allenberg, supra,* given the intrastate nature of the contract in *Sav-On-Drugs, supra.*